

U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2020 OCT 16  P 1: 52

CAROL L. MICHEL
CLERK

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

# FELONY

## SEALED

**INDICTMENT FOR CONSPIRACY TO COMMIT BANK
FRAUD AND MONEY LAUNDERING, BANK FRAUD,
<u>MONEY LAUNDERING, AND NOTICE OF FORFEITURE</u>**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.20 - 00106** |
| **v.** | * | **SECTION:** |
| | | **SECT. H MAG. 5** |
| **RYAN P. MULLEN** | * | **VIOLATIONS: 18 U.S.C. § 1344** |
| **DUANE A. DUFRENE** | | **18 U.S.C. § 1349** |
| | * | **18 U.S.C. § 1956** |
| | | **18 U.S.C. § 1957** |
| | * | **18 U.S.C. § 2** |

\*       \*       \*

The Grand Jury charges that:

<u>**COUNT 1**</u>
**(Conspiracy to Commit Bank Fraud)**

A.    <u>**AT ALL TIMES MATERIAL HEREIN:**</u>

1.    Beginning at an unknown time and continuing to on or about March of 2020, the

defendant, **RYAN P. MULLEN ("MULLEN")**, was a resident of Louisiana and Mississippi.

2.    Defendant, **DUANE A. DUFRENE ("DUFRENE")**, was a resident of Destrehan,

Louisiana, who operated a business out of his residence known as Simple Payroll Solutions, Inc.

Fee USA
Process_____
X Dktd_____
___ CtRmDep_____
___ Doc. No._____

**State Bank and Trust/Jayess, MS Residence**

3.      Individual A was the owner of a residence located in Jayess, Mississippi.

4.      TTJP, Inc. ("**MULLEN**/TTJP") was a corporate entity in the Eastern District of Louisiana registered with the Louisiana Secretary of State on or about September 27, 2017. **MULLEN** was the owner and officer of TTJP.

5.      State Bank and Trust Company was a financial institution with deposits insured by the Federal Deposit Insurance Corporation with a branch in Mississippi.

**Keesler Federal Credit Union/The Briars**

6.      Individuals B and C were the owners of a hotel known as "The Briars," which was located in Natchez, Mississippi.

7.      BSLMSP, Inc. ("**MULLEN**/BSLMSP") was a corporate entity in the Eastern District of Louisiana registered with the Louisiana Secretary of State on or about June 26, 2017. **MULLEN** was the owner and officer of BSLMSP.

8.      Briar Investments, Inc., ("**MULLEN**/Briar Investments") was a corporate entity in the Eastern District of Louisiana registered with the Louisiana Secretary of State on or about October 25, 2018. **MULLEN** was the owner and officer of Briar Investments.

9.      MOE Investments, LLC ("**DUFRENE**/MOE") was a corporate entity in the Eastern District of Louisiana registered with the Louisiana Secretary of State on or about March 9, 2017. **DUFRENE** was the owner and officer of MOE.

10.     RLKA Property Holdings, Inc. ("**DUFRENE**/RLKA") was a corporate entity in the Eastern District of Louisiana registered with the Louisiana Secretary of State on or about November 14, 2018. **DUFRENE** was the owner and officer of RLKA.

11.     Keesler Federal Credit Union ("Keesler FCU") was a federal credit union headquartered in Mississippi with accounts insured by The National Credit Union Share Insurance Fund.

12.     Integra Realty Resources ("Integra Realty") was an appraisal company with offices located in Mississippi.

### Red Oak Capital/Hotel Vue

13.     Companies A and A-1 were Mississippi limited liability corporations that owned a hotel and real property known as "Hotel Vue," which was located in Natchez, Mississippi.

14.     RVH Investments, Inc. ("**MULLEN**/RVH") was a corporate entity in the Eastern District of Louisiana registered with the Louisiana Secretary of State on or about June 19, 2019. **MULLEN** was the owner and officer of RVH.

15.     Global Strategic Solutions, LLC ("**DUFRENE**/Global Strategic") was a corporate entity r in the Eastern District of Louisiana registered with the Louisiana Secretary of State on or about October 24, 2012. **DUFRENE** was the owner and officer of Global Strategic.

16.     Red Oak Capital Group, LLC ("Red Oak") was a commercial lender based in Michigan, which participated in the mortgage lending business that affected interstate commerce.

17.     Northwind Financial Corporation ("Northwind") was a company based in Michigan, which was affiliated with Red Oak for the purpose of originating and processing commercial loans.

### Red Oak/Super 8

18.     Company B was a Mississippi corporation that owned a hotel known as "The Super 8," which was located in Natchez, Mississippi.

19.     ONRD, Inc. ("**MULLEN**/ONRD") was a corporate entity in the Eastern District of Louisiana registered with the Louisiana Secretary of State on or about February 21, 2017. **MULLEN** was the owner and officer of ONRD.

20.     Liberty Investment Solutions, Inc. ("**DUFRENE**/Liberty Investment") was a corporate entity in the Eastern District of Louisiana registered with the Louisiana Secretary of State on or about March 11, 2010. **DUFRENE** was the owner and officer of Liberty Investment.

<u>**Additional Parties/Entities**</u>

21.     HMY, LLC ("**MULLEN**/HMY") was a corporate entity in the Eastern District of Louisiana registered with the Louisiana Secretary of State on or about January 22, 2013. **MULLEN** was the owner and officer of HMY.

22.     22 Parlange, Inc. ("**DUFRENE**/22 Parlange") was a corporate entity in the Eastern District of Louisiana registered with the Louisiana Secretary of State on or about November 11, 2013. **DUFRENE** was the owner and officer of Parlange.

23.     EGHPC, Inc. ("**MULLEN**/EGHPC") was a corporate entity in the Eastern District of Louisiana registered with the Louisiana Secretary of State on or about November 28, 2016. **MULLEN** was the owner and officer of EGHPC.

24.     Camargue, Inc. ("**MULLEN**/Camargue") was a corporate entity in the Eastern District of Louisiana registered with the Louisiana Secretary of State on or about September 19, 2017. **MULLEN** was the owner and officer of Camargue.

25.     Park Ward, Inc. ("**MULLEN**/Park Ward") was a corporate entity in the Eastern District of Louisiana registered with the Louisiana Secretary of State on or about January 21, 2020. **MULLEN** was the owner and officer of Park Ward.

26.     Broker A was an individual who worked as a broker.

27.     Broker B was a company located in Pennsylvania that was in the business of connecting borrowers with prospective lenders.

28.     Individual D was a real estate attorney in Baton Rouge, Louisiana.

**B.     THE CONSPIRACY**:

Beginning at a time unknown, and continuing until on or about March 2020, in the Eastern District of Louisiana and elsewhere, **MULLEN** and **DUFRENE**, and others known and unknown to the grand jury, did knowingly and willfully combine, conspire, confederate, and agree with each other to execute or attempt to execute a scheme and artifice to defraud financial institutions, the funds of which were then federally insured and insured by The National Credit Union Share Insurance Fund, in order to secure financing for the purchases of a residence and hotel businesses by means of false and fraudulent pretenses, representations, or promises, in violation of Title 18, United States Code, Section 1344.

**C.     THE SCHEME AND ARTIFICE TO DEFRAUD**:

### Introduction

It was part of the scheme and artifice to defraud that beginning at an unknown time, but prior to on or about March 2020, **MULLEN** and **DUFRENE** devised a scheme to fraudulently obtain loans from financial institutions for a residential purchase and several hotel purchases, based on fraudulent financial information.

It was further part of the scheme and artifice to defraud that **MULLEN** and **DUFRENE** made false representations to financial institutions, among other entities, in order to further the scheme to defraud.

**State Bank and Trust/Jayess, MS Residence**

It was part of the scheme and artifice to defraud that **MULLEN** approached Individual A and began to negotiate a sale of a residence in Jayess, Mississippi, for the approximate sum of $800,000.

It was further part of the scheme and artifice to defraud that **MULLEN** applied for a $680,000 home equity loan from State Bank in his own name while using an address within the Eastern District of Louisiana for the purchase of the residence from Individual A.

It was further part of the scheme and artifice to defraud that as part of the loan application, **MULLEN**, with assistance from **DUFRENE,** provided State Bank falsified IRS tax forms and financial statements.

It was further part of the scheme and artifice to defraud that State Bank, relying upon the false documents and financial information provided by **MULLEN** and **DUFRENE**, approved **MULLEN's** loan application and provided **MULLEN** with $680,000 for the purchase of the Jayess residence by **MULLEN**/TTJP.

**Keesler Federal Credit Union/The Briars**

It was part of the scheme and artifice to defraud that **MULLEN** approached Individuals B and C, the owners of a bed and breakfast hotel in Natchez, Mississippi, known as The Briars, and began to negotiate a sale of the hotel for the approximate sum of $1.75 million on behalf of **DUFRENE**/MOE.

It was further part of the scheme and artifice to defraud that while **MULLEN** was negotiating with the Individuals B and C, **MULLEN** applied for a $2.8 million loan on behalf of **MULLEN**/BSLMSP from Keesler FCU for the purchase of The Briars.

It was further part of the scheme and artifice to defraud that as part of the loan application, **MULLEN** provided Keesler FCU with falsified IRS Forms 1040 Schedule C for The Briars, fraudulent IRS tax forms for himself and his businesses, and false financial statements from Prudential Securities and JP Morgan Securities, all in order to reflect false assets and false net profits to support a higher property valuation.

It was further part of the scheme and artifice to defraud that **MULLEN** advised Keesler FCU that the owner of The Briars, **DUFRENE**/MOE, was going to assign the rights of the property for resale purposes to **DUFRENE**/RLKA, while **MULLEN** intended to buy The Briars in the name of **MULLEN**/BSLMSP and then assign the rights of the property to **MULLEN**/Briar Investments.

It was further part of the scheme and artifice to defraud that **MULLEN**, with assistance from **DUFRENE**, provided Keesler FCU with a purchase agreement of $3.5 million between **DUFRENE**/RLKA and **MULLEN**/BSLMSP in support of the loan for $2.8 million.

It was further part of the scheme and artifice to defraud that **MULLEN** at no time informed Keesler FCU that **DUFRENE**/MOE or **DUFRENE**/RLKA had yet to purchase The Briars and that the agreed upon purchase price with Individuals B and C was only $1.75 million.

It was further part of the scheme and artifice to defraud that Keesler, relying upon the false documents and financial information provided by **MULLEN** and **DUFRENE**, approved **MULLEN's** loan application and provided **MULLEN**/Briars Investments with $2.8 million.

It was further part of the scheme and artifice to defraud that **DUFRENE**/MOE purchased The Briars from Individuals B and C for $1.75 million.

It was further part of the scheme and artifice to defraud that on the same day, **DUFRENE**/RLKA, as assignee from **DUFRENE**/MOE, sold The Briars to **MULLEN**/BSMLSP,

who then assigned title to **MULLEN**/Briars Investments for $3.5 million, with **MULLEN** utilizing the $2.8 million loan that he received from Keesler FCU to pay Individuals B and C for the original sale of the hotel to **DUFRENE**/MOE.

It was further part of the scheme and artifice to defraud that **MULLEN** kept the difference of approximately $965,000 that he fraudulently obtained from Keesler FCU and he later used the funds to purchase a number of luxury cars.

### Red Oak Capital/Hotel Vue

It was part of the scheme and artifice to defraud that **MULLEN** approached Companies A and A-1, the owners of a hotel and real estate property in Natchez, Mississippi, known as Hotel Vue, and began to negotiate a sale of the hotel for the approximate sum of $3.95 million on behalf of **DUFRENE**/Global Strategic.

It was further part of the scheme and artifice to defraud that **MULLEN** used Broker A and Broker B in order to find financing for the purchase of Hotel Vue.

It was further part of the scheme and artifice to defraud that Broker A and Broker B brought the proposed Hotel Vue sale to Northwind and Red Oak.

It was further part of the scheme and artifice to defraud that while **MULLEN** was negotiating with Companies A and A-1, **MULLEN** applied for a $6.4 million loan from Red Oak on behalf of **MULLEN**/RVH for the purchase of Hotel Vue.

It was further part of the scheme and artifice to defraud that **MULLEN**, with assistance from **DUFRENE**, provided Northwind and Red Oak either directly or through Brokers A and B or the appraiser, Integra Realty, fraudulent IRS tax forms for **MULLEN** and his businesses, falsified a list of owned properties owned by **MULLEN**, false financial statements from Prudential

Securities and Century Securities, falsified balance sheets for Hotel Vue, all in order to reflect false assets and false net profits to support a higher property valuation.

It was further part of the scheme and artifice to defraud that **MULLEN** provided Northwind and Red Oak with a purchase agreement of $8 million between **DUFRENE**/Global Strategic and **MULLEN**/RVH in support of the loan for approximately $6.4 million.

It was further part of the scheme and artifice to defraud that **MULLEN** at no time informed Northwind or Red Oak that **DUFRENE**/Global Strategic had yet to purchase Hotel Vue and that the agreed upon purchase price with Companies A and A-1 was only $3.95 million.

It was further part of the scheme and artifice to defraud that Red Oak, relying upon the false documents and financial information provided by **MULLEN** and **DUFRENE**, approved **MULLEN's** loan application and provided **MULLEN**/RVH with $6.4 million.

It was further part of the scheme and artifice to defraud that **DUFRENE**/Global Strategic purchased Hotel Vue from Companies A and A-1 for approximately $3.95 million.

It was further part of the scheme and artifice to defraud that on the same day, **DUFRENE**/Global Strategic sold Hotel Vue to **MULLEN**/RVH for $8 million, with **MULLEN** utilizing the $6.4 million loan that he received from Red Oak to pay Companies A and A-1 for the original sale of the hotel to **DUFRENE**/Global Strategic.

It was further part of the scheme and artifice to defraud that **MULLEN** kept the difference of approximately $1.3 million that he fraudulently obtained from Red Oak and he later used the funds to purchase a number of luxury cars.

## Red Oak Capital/Super 8

It was part of the scheme and artifice to defraud that **MULLEN** approached Company B, the owners of a hotel in Natchez, Mississippi, known as Super 8, and began to negotiate a sale of the hotel for the approximate sum of $2.6 million on behalf of **DUFRENE**/Liberty Investment.

It was further part of the scheme and artifice to defraud that **MULLEN** used Broker A in order to find financing for the purchase of Super 8.

It was further part of the scheme and artifice to defraud that Broker A brought the proposed Super 8 sale to Northwind and Red Oak.

It was further part of the scheme and artifice to defraud that while **MULLEN** was negotiating with Company B, **MULLEN** applied for a $4.575 million loan from Red Oak on behalf of **MULLEN**/ONRD for the purchase of Super 8.

It was further part of the scheme and artifice to defraud that **MULLEN**, with assistance from **DUFRENE**, provided Northwind and Red Oak either directly or through Broker A or the appraiser, Integra Realty, falsified balance sheets for Super 8, all in order to reflect false assets and false net profits to support a higher property valuation.

It was further part of the scheme and artifice to defraud that **MULLEN** provided Northwind and Red Oak with a purchase agreement of $6.05 million between **DUFRENE**/Liberty Investment and **MULLEN**/ONRD in support of the loan for approximately $4.575 million.

It was further part of the scheme and artifice to defraud that **MULLEN** at no time informed Northwind or Red Oak that **DUFRENE**/Liberty Investment had yet to purchase Super 8 and that the agreed upon purchase price with Company B was only $2.6 million.

It was further part of the scheme and artifice to defraud that Red Oak, relying upon the false documents and financial information provided by **MULLEN** and **DUFRENE**, approved **MULLEN's** loan application and provided **MULLEN**/ONRD with $4.575 million.

It was further part of the scheme and artifice to defraud that **DUFRENE**/Liberty Investment purchased Super 8 from Company B for approximately $2.6 million.

It was further part of the scheme and artifice to defraud that on the same day, **DUFRENE**/Liberty Investment sold Super 8 to **MULLEN**/ONRD for $6.05 million, with **MULLEN** utilizing the $4.575 million loan that he received from Red Oak to pay Company B for the original sale of the hotel to **DUFRENE**/Liberty Investment.

It was further part of the scheme and artifice to defraud that **MULLEN** kept the difference of approximately $1.3 million that he fraudulently obtained from Red Oak and he later used the funds to purchase a number of luxury cars.

**D.    OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY:**

**State Bank and Trust/Jayess, MS Residence**

1.     On or about December 2017, **MULLEN** approached Individual A and began to negotiate a sale of a residence for the approximate sum of $800,000.

2.     On or about January 3, 2018, **MULLEN** applied for a $680,000 home equity loan from State Bank in his own name while using an address within the Eastern District of Louisiana for the purchase of the residence from Individual A.

3.     On or about January 3, 2018, **DUFRENE** emailed **MULLEN** false financial statements for his business, ACPRM, LLC, with the message "Let me know how the balance sheet looks."

11

4. On or about January 4, 2018, **MULLEN** provided State Bank false financial statements, which reflected significant assets for himself and his business, ACPRM, LLC, with the message "Client copy."

5. On or about January 9, 2018, **DUFRENE** falsified 2016 IRS Forms 1040 for **MULLEN's** individual return and emailed them to **MULLEN**.

6. On or about January 10, 2018, **MULLEN** provided State Bank fraudulent 2016 IRS Forms 1040 and for himself and his businesses, ACPRM, LLC; EGHPC, Inc.; ONRD; BSLMSP; Hurricane Construction & Equipment; Camargue; and TTJP, which had been prepared by **DUFRENE**.

7. On or about February 23, 2018, State Bank approved **MULLEN's** loan application and provided **MULLEN** with $680,000 for the purchase of the Jayess residence.

8. On or about February 23, 2018, **MULLEN** purchased the Jayess residence in the name of **MULLEN** /TTJP with the funds that he borrowed from State Bank.

## Keesler Federal Credit Union/The Briars

9. On or about August 2018, **MULLEN** approached Individuals B and C, the owners of The Briars, and began to negotiate a sale of the bed and breakfast hotel for the approximate sum of $1.75 million on behalf of **DUFRENE**/MOE.

10. On or about September 2018, **MULLEN**/BSLMSP applied to Keesler FCU for a loan of approximately $2.8 million in order to purchase The Briars, premised upon a purchase price of $3.5 million between **DUFRENE**/MOE and **MULLEN**/BSLMSP.

11. On or about September 5, 2018, Individual B emailed **MULLEN** IRS Forms 1040 Schedule C for The Briars, which reported losses in the years 2015, 2016, and 2017.

12.     On or about September 5, 2018, **MULLEN** emailed the 2015, 2016, and 2017 IRS Forms 1040 Schedule C for The Briars to **DUFRENE**.

13.     On or about September 5, 2018, **DUFRENE** falsified the 2015, 2016, and 2017 IRS Forms 1040 Schedule C for The Briars that **MULLEN** had obtained from Individual B to reflect false net profits in support of a higher property valuation.

14.     On or about September 5, 2018, **DUFRENE** emailed the falsified 2015, 2016, and 2017 IRS Forms 1040 Schedule C for The Briars to **MULLEN**, who then transmitted the false documents to Keesler FCU on the same date.

15.     On or about September 5, 2018, **DUFRENE** emailed a falsified personal financial statement for **MULLEN** to **MULLEN**.

16.     On or about October 3, 2018, **MULLEN** provided Keesler FCU false financial statements from Prudential Securities and JP Morgan Securities, which reflected significant assets for himself and his businesses.

17.     On or about October 8, 2018, **DUFRENE**/MOE and Individuals B and C executed an agreement to purchase for The Briars in the amount of $1.75 million.

18.     On or about October 16, 2018, **MULLEN**/BSLMSP assigned its interests in The Briars purchase to **MULLEN**/Briars Investments, and **DUFRENE**/RLKA assigned its interests in The Briars to **DUFRENE**/MOE.

19.     On or about October 17, 2018, **MULLEN** provided Keesler FCU with a purchase agreement of $3.5 million between **DUFRENE**/RLKA and **MULLEN**/BSLMSP in support of the loan for $2.8 million.

20.     On or about November 12, 2018,  **MULLEN** transmitted the falsified 2015, 2016, and 2017 IRS Forms 1040 Schedule C for The Briars to the appraiser, Integra Realty.

21.     On or about December 7, 2018, Keesler FCU approved **MULLEN's** loan application and provided **MULLEN**/Briars Investments, as assignee from **MULLEN**/BSLMSP, with $2.8 million, with **MULLEN** acting as a guarantor on the loan.

22.     On or about December 7, 2018, **DUFRENE**/MOE purchased The Briars from Individuals B and C for the approximate sum of $1.75 million.

23.     On or about December 7, 2018, **DUFRENE**/RLKA sold The Briars to **MULLEN**/BSLMSP for $3.5 million, with **MULLEN** utilizing the $2.8 million loan that he received from Keesler FCU to pay Individuals B and C for the original sale of the hotel to **DUFRENE**/MOE.

24.     On or about December 14, 2018, the closing attorney for Individuals B and C wired approximately $1,036,700 to Individual D as the net proceeds from the sale of The Briars.

25.     On or about December 14, 2018, and December 21, 2018, Individual D wired approximately $965,000 to **MULLEN**/Briars Investments.

### Red Oak Capital/Hotel Vue

26.     On or about 2019, **MULLEN** approached Companies A and A-1, the owners of a hotel and property in Natchez, Mississippi, known as Hotel Vue, and began to negotiate a sale of the hotel and property for the approximate sum of $3.95 million on behalf of **DUFRENE**/Global Strategic.

27.     On or about May 9, 2019, the owners of Company A sent their 2016, 2017, and 2018 IRS Form 1065 tax returns to an associate of **MULLEN**, who was assisting with the negotiations.

28.     On or about May 9, 2019, **MULLEN's** associate emailed Company A's 2016, 2017, and 2018 IRS Form 1065 tax returns to **MULLEN**.

29.     On or about May 9, 2019, **MULLEN** emailed Company A's 2016, 2017, and 2018 IRS Form 1065 tax returns to **DUFRENE**.

30.     On or about May 19, 2019, **DUFRENE** emailed **MULLEN** a falsified 2018 Annual Income Statement for Company A, with the message "Tell me what you think."

31.     On or about May 23, 2019, **DUFRENE** emailed **MULLEN** falsified 2017 IRS Form 1065 tax returns for Company A.

32.     On or about May 24, 2019, **DUFRENE** emailed **MULLEN** falsified 2018 IRS Form 1065 tax returns for Company A.

33.     On or about June 10, 2019, **MULLEN** emailed **DUFRENE** a Century Securities financial statement in the name of a person who was deceased.

34.     On or about June 13, 2019, **DUFRENE** emailed **MULLEN** a falsified Century Securities financial statement in **MULLEN's** name that was copied from the statement sent on June 10, 2018.

35.     On or about June 17, 2019, **DUFRENE** emailed **MULLEN** falsified 2018 and 2019 Annual Income statements and balance sheets for Company A, with the message "I will do 2017."

36.     On or about June 18, 2019, **MULLEN** emailed an appraiser, Integra Realty, falsified 2017, 2018, and 2019 income statements for Company A, with the message "This is what i [sic] picked up from the Vue this morning thanks."

37.     On or about June 21, 2019, **MULLEN** emailed Integra Realty an agreement to purchase between buyer **MULLEN**/RVH and seller **DUFRENE**/Global Strategic for Hotel Vue in the amount of $8 million, with the message "Here you go thanks."

38.     On or about September 18, 2019, **MULLEN** emailed Broker A falsified 2016 and 2018 IRS Form 1065 tax returns for Company A.

39.     On or about October 13, 2019, **DUFRENE** emailed **MULLEN** falsified Annual Income Statements from October 2018 to September 2019 for Hotel Vue with the message "What you think."

40.     On or about October 13, 2019, **MULLEN** emailed "Looks romantic" to **DUFRENE** concerning the Hotel Vue falsified financial records.

41.     On or about October 13, 2019, **DUFRENE** emailed **MULLEN** the message "Should I lower the revenue some on the wedding hotel rooms. They [sic] way I have it makes it look 90% occupied each month.  I could lower it to where profit is 100k to 120k a month overall or closer to 80k a month."

42.     On or about November 2019, Broker A contacted Broker B on **MULLEN's** behalf to seek a lender for the Hotel Vue transaction.

43.     On or about November 2019, Broker B contacted Northwind, a company affiliated with the lender, Red Oak, for a loan of approximately $6.4 million by **MULLEN/RVH** to purchase Hotel Vue.

44.     On or about November 25, 2019, **DUFRENE** emailed **MULLEN** a 2018 IRS From 1040, which reflected significant assets for **MULLEN** and the businesses he owned, with the message exchange: "[**DUFRENE**] How is this? [**MULLEN**] Looks OK to me but I don't know what the hell I'm looking at."

45.     On or about November 25, 2019, **DUFRENE** emailed **MULLEN** a falsified list of properties allegedly owned by **MULLEN**.

46.     On or about November 25, 2019, **MULLEN** emailed **DUFRENE** and advised him that he needed to "up" the number of rental units in order to bolster **MULLEN's** financial background.

47.     On or about November 25, 2019, **DUFRENE** emailed **MULLEN** a revised falsified list of properties allegedly owned by **MULLEN**, which included a larger number of rental units.

48.     On or about November 26, 2019, **MULLEN** emailed the 2018 IRS Form 1040 in **MULLEN's** name that was created by **DUFRENE** to Broker A.

49.     On or about November 26, 2019, **DUFRENE** emailed **MULLEN** a revised falsified list of properties allegedly owned by **MULLEN**, which included a larger number of rental units.

50.     On or about November 26, 2019, **MULLEN** transmitted the falsified list of properties allegedly owned by **MULLEN** and created by **DUFRENE** to Broker A.

51.     On or about November 26, 2019, Broker A provided Broker B the falsified 2016 and 2017 tax returns and financial statements that **MULLEN** emailed to Broker A. Broker B in turn provided the falsified tax returns and financial statements to Northwind and Red Oak.

52.     On or about December 19, 2019, Red Oak approved **MULLEN's** loan application and provided **MULLEN** with $6.4 million for the $8 million purchase between **DUFRENE**/Global Strategic and **MULLEN**/RVH.

53.     On or about December 19, 2019, **DUFRENE**/Global Strategic purchased Hotel Vue and its property from Companies A and A-1, for approximately $3.95 million.

54.     On or about December 19, 2019, **DUFRENE**/Global Strategic sold Hotel Vue to **MULLEN**/RVH for $8 million, with **MULLEN** utilizing the $6.4 million loan that he received from Red Oak to pay Companies A and A-1 for the original sale of the hotel and property to **DUFRENE**/Global Strategic.

55.     On or about December 19, 2019, Red Oak wired approximately $5,792,000 for the sale of Hotel Vue to the bank account for a title company owned by Individual D.

56.     On or about December 19, 2019, Individual D's title company transferred approximately $5,792,000 to a trust account owned by Individual D.

57.     On or about December 20, 2019, Individual D transferred approximately $2,277,722 from his/her trust account to **MULLEN**/RVH's bank account.

58.     On or about December 20, 2019, **MULLEN**/RVH transferred approximately $2,277,722 from his bank account to **MULLEN**/Camargue's bank account.

59.     On or about December 24, 2019, and December 27, 2019, Individual D transferred approximately $1.3 million from his/her trust account to **MULLEN**/BSLMSP.

### **Red Oak Capital/Super 8**

60.     On or about 2020, **MULLEN** approached Company B, the owner of a hotel in Natchez, Mississippi, known as Super 8, and began to negotiate a sale of the hotel for the approximate sum of $2.6 million.

61.     On or about January 2020, **MULLEN**/ONRD applied to Northwind/Red Oak through Broker A for a loan of approximately $4.575 million loan for the purchase of Super 8, premised upon the purchase price of $6.05 million between **DUFRENE**/Liberty Investment and **MULLEN**/ONRD.

62.     On or about February 10, 2020, **DUFRENE** emailed falsified 2017, 2018, and 2019 Income Statements and industry reports for Super 8 to **MULLEN**.

63.     On or about February 10, 2020, **MULLEN** emailed falsified 2017, 2018, and 2019 Income Statements and industry reports for Super 8 created by **DUFRENE** to Integra Realty and Broker A.

64.    On or about February 24, 2020, Broker A transmitted the falsified 2017, 2018, and 2019 Income Statements and a falsified 2019 Balance Sheet for Super 8 created by **DUFRENE** to Northwind and Red Oak.

65.    On or about February 25, 2020, Broker A emailed Red Oak an agreement to purchase Super 8 between **DUFRENE**/Liberty Investment and **MULLEN**/ONRD for $6.05 million, along with a copy of a Super 8 franchise agreement, in support of the loan for approximately $4.575 million.

66.    On or about March 10, 2020, Red Oak approved **MULLEN's** loan application and provided **MULLEN**/ONRD with $4.575 million.

67.    On or about March 10, 2020, **DUFRENE**/Liberty Investment purchased Super 8 from Company B for approximately $2.6 million.

68.    On or about March 10, 2020, **DUFRENE**/Liberty Investment sold Super 8 to **MULLEN**/ONRD for $6.05 million, with **MULLEN** utilizing the $4.575 million loan that he received from Red Oak to pay Company B for the original sale of the hotel to **DUFRENE**/Liberty Investment.

69.    On or about March 10, 2020, Red Oak wired approximately $4,140,375 to the trust account for Individual D.

70.    On or about March 12, 2020, Individual D transferred approximately $1.3 million from his/her trust account to **MULLEN**/BSLMSP's bank account.

71.    On or about the dates listed below, **MULLEN** used the funds fraudulently obtained from Keesler FCU and Red Oak to purchase the following luxury cars:

| Vehicle Make & Model | VIN Number | Purchase Date | Sales Price | Seller | Purchaser | Name & account number proceeds derived from |
|---|---|---|---|---|---|---|
| 2009 Rolls Royce Phantom V | SCA1L6855 9UX23211 | 1/10/2020 | $113,000.00 | U.S. | Camargue, Inc. | Camargue, Inc. #3697752180 |
| 2006 Bentley Arnage | SCBLF34F4 6CX11139 | 1/27/2020 | $21,500.00 | G.A.A. | EGHPC, Inc. | Camargue, Inc. #3697752180 |
| 2002 Bentley Arnage | SCBLF34F5 2CX08762 | 2/6/2020 | $13,029.39 | S.D. | EGHPC, Inc. | EGHPC, Inc. #3697755100 |
| 1983 Bentley | SCBZ0T01 DCX07127 | 2/12/2020 | $5,000.00 | C.E., LLC | Park Ward, Inc. | BSLMSP, Inc. #5855323233 |
| 1954 Rolls International | LSFN11 | 3/12/2020 | $55,000.00 | D.P. | Park Ward, Inc. | Camargue, Inc. #3697752180 |
| 2005 Bentley Arnage | SCBLE37G X5CX19347 | 3/12/2020 | $50,000.00 | P.C.M., Inc. | Park Ward, Inc. | Camargue, Inc. #3697752180 |
| 2006 Bentley Arnage | SCBLE37G 86CX19400 | 3/12/2020 | $53,000.00 | P.C.M., Inc. | Park Ward, Inc. | Camargue, Inc. #3697752180 |
| 1961 Rolls Royce Phantom | 5LBV35 | 3/13/2020 | $55,000.00 | L.W. | Park Ward, Inc. | Camargue, Inc. #3697752180 |
| 1997 Rolls Royce | SCAZN19C 4VCX59579 | 3/13/2020 | $34,000.00 | L.U. | Park Ward, Inc. | Camargue, Inc. #3697752180 |
| 1997 Rolls Royce | SCAZN19C 9VCX59691 | 3/13/2020 | $34,000.00 | L.U. | Park Ward, Inc. | Camargue, Inc. #3697752180 |
| 1997 Rolls Royce | SCAZN19C 7VCX60158 | 3/13/2020 | $34,000.00 | L.U. | Park Ward, Inc. | Camargue, Inc. #3697752180 |
| 1960 Rolls Royce Phantom V | 5LAS35 | 3/13/2020 | $165,000.00 | E.A. | Park Ward, Inc. | Camargue, Inc. #3697752180 |
| 2002 Chevrolet Silverado | 1GCJC3313 2F100112 | 3/19/2020 | $16,500.00 | M.M. | EGHPC, Inc. | BSLMSP, Inc. #5855323233 |
| 1979 Cadillac Eldorado | 6L57N9E62 5071 | 4/14/2020 | $14,724.00 | C.V.G. | Park Ward, Inc. | BSLMSP, Inc. #5855323233 |
| 1997 Bentley Turbo | SCBZP14C 5VCX59491 | 4/16/2020 | $13,500.00 | R.H. | Park Ward, Inc. | EGHPC, Inc. #3697755100 |
| 1997 Bentley Turbo | SCBZP14C 3VCX59280 | 4/16/2020 | $11,500.00 | J.D. | Park Ward, Inc. | EGHPC, Inc. #3697755100 |

| 1976 Cadillac Fleetwood | 6B69S6Q232006 | 4/20/2020 | $16,000.00 | S.P. | EGHPC, Inc. | Camargue, Inc. #3697752180 |
|---|---|---|---|---|---|---|
| 1976 Cadillac Fleetwood | 6B69560289259 | 4/29/2020 | $12,000.00 | A.A., Inc. | Camargue, Inc. | Camargue, Inc. #3697752180 |
| 1976 Cadillac Fleetwood | 6B69S6Q280343 | 5/15/2020 | $12,000.00 | V.G | Camargue, Inc. | EGHPC, Inc. #3697755100 |
| 2012 Mercedes | WDDNG8DBOCA442468 | 6/12/2020 | $23,900.00 | S.K. | EGHPC, Inc. | EGHPC, Inc. #3697755100 |

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2 - 5
### (Bank Fraud)

**A.      AT ALL TIMES MATERIAL HEREIN:**

The allegations contained in Parts A, C, and D of Count 1 are hereby re-alleged and incorporated herein by reference.

**B.      THE OFFENSE:**

On or about the dates and in the approximate amounts listed below, in the Eastern District of Louisiana and elsewhere, the defendants, **RYAN P. MULLEN** and **DUANE A. DUFRENE**, for the purpose of executing the scheme and artifice to defraud set forth in Part C of Count 1, knowingly and willfully defrauded State Bank and Trust, the deposits of which were insured by the FDIC, Keesler Federal Credit Union, the accounts of which were insured by the National Credit Union Insurance Fund, and Red Oak Capital Group, LLC, a financial institution in the mortgage lending business, and used fraudulent financial information to obtain monies, funds, credits, and assets owned by and under the custody and control of State Bank and Trust, Keesler Federal Credit Union and Red Oak Capital Group, LLC, by means of false and fraudulent pretenses, representations, and promises, as described below:

21

| COUNT | Loan Application Date (Approx.) | Date Loan Received (Approx.) | Financial Institution | Approximate Loan Amount | Property | False Financial Information |
|---|---|---|---|---|---|---|
| 2 | January, 2018 | February 23, 2018 | State Bank and Trust | $800,000 | Jayess, MS | Financial statement; 2016 IRS Form 1040 |
| 3 | October, 2018 | December 7, 2018 | Keesler Federal Credit Union | $2.8 million | The Briars Bed & Breakfast Hotel, Natchez, MS | Prudential and JP Morgan documents; 2015-2017 The Briars IRS Schedule Cs |
| 4 | November, 2019 | December 19, 2019 | Red Oak | $6.4 million | The Hotel Vue, Natchez, MS | 2016-2018 Hotel Vue IRS Form 1065s; 2017-2019 Hotel Vue income statements; 2016-2017 IRS 1040 Forms; Prudential and Century documents |
| 5 | January, 2020 | March 10, 2020 | Red Oak | $4.575 million | Super 8 Hotel, Natchez, MS | 2017-2019 Super 8 income statements and 2019 balance sheet |

All in violation of Title 18, United States Code, Sections 1344 and 2.

## Count 6
### (Conspiracy to Commit Money Laundering 18 U.S.C. § 1956)

**A.    AT ALL TIMES MATERIAL HEREIN:**

1.    The allegations contained in Counts 1 through 6 are reincorporated herein by reference.

2.    Wells Fargo & Company ("Wells Fargo") was a financial institution that offers on-line banking to depositors throughout the United States.

3.      **MULLEN**/HMY and **MULLEN**/BSLMSP maintained a bank account with Wells Fargo.

4.      JPMorgan Chase Bank, N.A. ("JP Morgan") was a financial institution with a branch located in the Eastern District of Louisiana.

5.      The First, a National Banking Association ("The First"), was a financial institution with a branch located in the Eastern District of Louisiana.

6.      **DUFRENE**/MOE maintained a bank account with JPMorgan.

7.      **DUFRENE**/22 Parlange maintained a bank account with The First.

8.      A specified unlawful activity as defined in Title 18, United States Code, Sections 1956(c)(7)(A) and 1961(1) includes bank fraud in violation of Title 18, United States Code, Section 1344.

**B.      THE CONSPIRACY**:

Beginning at a time unknown, but before March 20, 2020, and continuing through in or near the date of this Indictment, in the Eastern District of Louisiana, and elsewhere, defendants **RYAN P. MULLEN** and **DUANE A. DUFRENE** did knowingly and willfully combine, conspire, confederate and agree with others to engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, in violation of Title 18, United States Code, Section 1957; all in violation of Title 18 United States Code, Section 1956(h).

**C.      OVERT ACTS**:

On or about the dates below, **RYAN P. MULLEN** and **DUANE A. DUFRENE**, and others caused the following wire transfers from bank accounts controlled by **MULLEN** at Wells Fargo

to bank accounts controlled by **DUFRENE** at JP Morgan and The First, relating to payments that were the proceeds of the conspiracy to commit bank fraud described in Count 1.

| OVERT ACT | WIRE DATE | AMOUNT | PAYOR | PAYEE |
|---|---|---|---|---|
| 1 | 12/14/2018 | $30,000 | MULLEN/HMY Wells Fargo | DUFRENE/MOE JP Morgan |
| 2 | 1/7/2020 | $30,000 | MULLEN/BSLMSP Wells Fargo | DUFRENE/22 Parlange The First |
| 3 | 3/13/2020 | $30,000 | MULLEN/BSLMSPY Wells Fargo | DUFRENE/22 Parlange The First |

All in violation of Title 18, United States Code, Section 1956(h).

### Counts 7 - 9
### (Money Laundering 18 U.S.C. § 1957)

On or about the dates indicated below, in the Eastern District of Louisiana and elsewhere, defendants, **RYAN P. MULLEN** and **DUANE A. DUFRENE**, did knowingly engage and attempt to engage in monetary transactions by, through, or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is the deposit, withdrawal, and transfer of funds in the amounts indicated below, such property having been derived from a specified unlawful activity, that is bank fraud in violation of Title 18, United States Code, Section 1344 involving fraudulent transactions with a financial institution in furtherance of the scheme:

| COUNT | DATE | TYPE | PAYOR | PAYEE | AMOUNT |
|---|---|---|---|---|---|
| 7 | 12/14/2018 | Bank wire - Wells Fargo to JP Morgan | MULLEN/HMY | DUFRENE/MOE | $30,000 |
| 8 | 1/7/2020 | Bank wire - Wells Fargo to The First | MULLEN/BSLMSP | DUFRENE/22 Parlange | $30,000 |
| 9 | 3/13/2020 | Bank wire - Wells Fargo to The First | MULLEN/BSLMSP | DUFRENE/22 Parlange | $30,000 |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## NOTICE OF FORFEITURE

1.      The allegations of Counts 1 through 9 of this Indictment are incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States.

2.      As a result of the offenses alleged in Counts 1 through 5, the defendants, **RYAN P. MULLEN** and **DUANE A. DUFRENE**, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly, as a result of such violations. The property to be forfeited includes, but not limited to, the following:

> 2009 Rolls Royce Phantom V, bearing VIN SCA1L68559UX23211;
>
> 2006 Bentley Arnage, bearing VIN SCBLF34F46CX11139;
>
> 2002 Bentley Arnage, bearing VIN SCBLF34F52CX08762;
>
> 1983 Bentley, bearing VIN SCBZ0T01DCX07127;
>
> 1954 Rolls Royce International, bearing VIN LSFN11
>
> 2005 Bentley Arnage, bearing VIN SCBLE37GX5CX19347;
>
> 2006 Bentley Arnage, bearing VIN SCBLE37G86CX19400;
>
> 1961 Rolls Royce Phantom, bearing VIN 5LBV35;
>
> 1997 Rolls Royce, bearing VIN SCAZN19C4VCX59579;
>
> 1997 Rolls Royce, bearing VIN SCAZN19C9VCX59691;
>
> 1997 Rolls Royce, bearing VIN SCAZN19C7VCX60158;
>
> 1960 Rolls Royce Phantom V, bearing VIN 5LAS35;
>
> 2002 Chevrolet Silverado, bearing VIN 1GCJC33132F100112;
>
> 1979 Cadillac Eldorado, bearing VIN 6L57N9E625071;
>
> 1997 Bentley Turbo, bearing VIN SCBZP14C5VCX59491;

1997 Bentley Turbo, bearing VIN SCBZP14C3VCX59280;

1976 Cadillac Fleetwood, bearing VIN 6B69S6Q232006;

1976 Cadillac Fleetwood, bearing VIN 6B69560289259;

1976 Cadillac Fleetwood, bearing VIN 6B69S6Q280343;

2012 Mercedes S Class, bearing VIN WDDNG8DBOCA442468;

31 Irving Lane, Natchez, Ms. 39120:
A certain piece or parcel of ground designated as Tracts A, B, C, together with the assignment of the Roadway Easement rights which is a portion of "The Briars" situated in Sections 24, 25, and 26, T-7-N, R-3-W, Adams County, Mississippi being more particularly described on the Map of the Division of Portion of "The Briars" depicted as Parcels 2 and 3- Group A - Tax Map 44 prepared for Leon Atkins situated in Sections 24, 25, and 26, T- 7-N, R-3-W, Adams County prepared by Luther L. Marling, Reg P.L.S. of Jordan, Kaiser and Sessions, LLC, Natchez, MS;

10 Grand Soleil Blvd., Natchez, Ms. 39120:
DESCRIPTION OF A 1.29 ACRE PORTION OF PARCEL 1.2, GROUP "A", TAX MAP 44, SITUATED IN SECTION 24, T7N-R2W, CITY OF NATCHEZ, ADAMS COUNTY, MISSISSIPPI.
Commencing at a concrete right-of-way monument found at the most Northerly comer of Natchez Summit Corporation Property, being Parcel 1.2, Group "A", Tax Map 44, as described by deed recorded in Deed Book 13-W, page 334 of the records in the office of the Chancery Clerk of Adams County, Mississippi, run S 39°05'42" E along the Southwesterly right-of-way line of U.S. Highway No. 65, 84 & 98 for a distance of 98.59 feet to a concrete right-of-way monument found; thence run along said right-of-way, being the arc of a curve to the right having a radius of 7724.47 feet and an arc length of 147.79 feet, and said arc having a chord bearing of S 45°15'54" E and a chord length of 147.78 feet; thence leaving said right-of-way run S 46°47'07" W for a distance of 50.00 feet; thence run along the, arc being the arc of a curve to the right having a radius of 7674.47 feet and an arc length of 182.98 feet, and said arc having a chord bearing of S 44°0.2'37" E and a chord length of 182.97 feet to a 5/a" iron rod set at the mm,t Northerly comer of within described 1.29 acre parcel for the point of beginning.

Thence from the said point of beginning run along the arc of a curve to the right having a radius of 7674.47 feet and an arc length of 168.94 feet, and said arc having a chord bearing of S 42°43'48" E and a chord length of 168.93 feet to a %" iron rod set; thence run S 06°37'56" VI/ for a distance of 116.70 feet to a%" iron rod set; thence run S 17°54'00"' W for a distance of 56.90 feet to a%" iron rod set; thence run N 88°14'13"' W for a distance

of 214.53 feet to a%" iron rod set on the Westerly boundary line of the above reference Parcel 1.2, Group "A", Tax Map 44; thence mn N 03°20'00" W along said boundary line for a distance of 59.43 feet to a *Yz"* iron rod found; thence rw1 N 00°17'00" E along said boundary line for a distance of 75.61 feet to a *Yz"* iron rod found; thence run N 37°00'00" W along said boundary line for a distance of 30.05 feet to a %" iron rod set; thence leaving said boundary line run N 49°45'29" E for a distance of 199.09 feet to the point of beginning.

The within described Tract contains 1.29 acres, as shown on the plat attached hereto as Exhibit "A".

Being a portion of that certain property acquired by Natchez Summit Corporation by virtue of that certain Exchange Deed Charisma Corporation of America dated December 4, 1997 and filed for record in Deed Book 20X at Page 562 of the records in the office of the Chancery Clerk of Adams County, Mississippi.

Together with a perpetual, non-exclusive easement and right-of-way for ingress and egress over and across what is now known as the Ramada Private Drive, a paved or hard surfaced roadway, sixty feet in width, and being presently utilized for ingress and egress to and from the property above described and said United States Highways 65, 84 and 98.

Together with a perpetual, non-exclusive easement and right-of-way for ingress and egress, utilities, and other purposes on, over and across a strip of land fifty feet in width more particularly described as:

DESCRIPTION OF A 50 FOOT STREET THROUGH A PORTION OF PARCEL 1.2, GROUP "A", TAX MAP 44, SITUATED IN SECTION 24, T7N-R2W, CITY OF NATCHEZ, ADAMS COUNTY, MISSISSIPPI.

Commencing at a concrete right-of-way monument found at the most Northerly comer of Natchez Summit Corporation Property, being Parcel 1.2, Group "A", Tax Map 44, as described by deed recorded in Deed Book 13-W, page 334 of the records in the office of the Chancery Clerk of Adams County, Mississippi, run S 39°05'42" E along the Southwesterly right-of-way line of U.S. Highway No. 65, 84 & 98 for a distance of 98.59 feet to a concrete right-of-way monument found; thence run along said right-of-way, being the arc of a curve to the right having a radius of 7724.47 feet and an arc length of 147.79 feet, and said arc having a chord bearing of S 45° 15'54" E and a chord length of 147.78 feet; thence leaving said right-of-way run S 46°47'07" W for a distance of 50.00 feet; thence run along the arc of a curve to the right having a radius of 7674.47 feel and an arc length of 182.98 feet, and said arc having a chord bearing of S 44°02'37" E and a chord length of 182.97 feet to a%" iron rod set at the most Northerly comer of a 1.29 acre parcel for the point of beginning.

Thence from the said point of beginning run N 49'45'29" E along the Northwesterly hue of said 1.29 acre parcel for a distance of 50.07 feet to a point on the Southwesterly right-of-way line of U.S. Highway No. 65, 84 & 98; thence run along said right-of-way, being the arc of a curve to the right having a radius of 7724.47 feet and an arc length of 189.99 feet, and said arc having a chord bearing of S 4T38'09" E and a chord length of 189.98 feet; thence run S 06°37'56" W along said right-of-way for a distance of 144.24 feet; the arc run S 17'54'00" W along said right-of-way for a distance of 45.90 feet; thence leaving said right-of-way, run along the Northwesterly line of a 60 foot easement, being the arc of a curve to the right having a radius of 256.48 feet and an arc length of 1.43 feet, and said arc having a chord bearing of S 12'03'10" W and a chord length of 1.43 feet; thence run the line of said easement, being the arc of a curve to the right having a radius of 256.48 feet and an arc length of 74.24 feet, and said arc having a chord bearing of S 20°30'17" W and a chord length of 73.98 feet; thence leaving said easement run N 61°12'09" W for a distance of 50.00 feet; thence run N 20'33'15" E for a distance of 50.00 feet to the Southerly boundary line of a 1.29 acre parcel; thence run N 1 *T54'00"* E along the Easterly boundary line of said parcel for a distance of 56.90 feet; thence run N 06'37'56" E along said boundary line for a distance of 116.70 feet; thence run along said boundary line, being the arc of a curve to the left having a radius of 7674.47 feet and an arc length of 168.94 feet, and said arc having a chord bearing of N 42'43'48" \Vanda chord length of 168.93 feet to the point of beginning.

The above described property, easement and access road are shown, depicted and delineated on that certain plat prepared by Robert E. Greene, Jordan, Kaiser and Sessions dated July 25, 2006 and attached hereto as Exhibit "A";

130 John R. Junkin Dr., Natchez, Ms. 39120:
SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR ALL PURPOSES AND AS SHOWN ON EXHIBIT "B" WHICH IS A MAP OF SURVEY OF PARCEL 1, GROUP "A," TAX MAP 44, SITUATED IN SECTION 24, T7N-R3W, CITY OF NATCHEZ, ADAMS COUNTY, MISSISSIPPI, PREPARED BY JEFFREY M. MESSINGER, PLC, DATED December 11, 2019;

12 Roberts Rd., Jayess, Ms. 391641:
A parcel of land located and situated in the Northwest Quarter of the Southeast Quarter NW1/4 of SE 1/4), Section 20, Township 4 North, Range 11 East, Walthall County, Mississippi and being more particularly described as follows as to wit:
Commence at a found nail at the SE corner of the NW1/4 of the SE1/4ofSection 20, T-4-N, R-10-E, Walthall County, Mississippi and 1un NOO degrees 0413311W - 435.67' to a set 1/2" rebar at the point of beginning. From the point of beginning, run thence S17 degrees 25'03"W - 175.85' to a set 1/2" rebar; thence run S00 degrees 40'4811E- 267 .071 to a set mag nail at the South line of the NW 1/4 of the SE 1/4 of Section 20, T-

4-N, R-10-E, Walthall County, Mississippi; thence run along the South line of the NW 1/4 of the SE 1/4 of Section 20, T-4-N, R-10-E, Walthall County, Mississippi N89 degrees 11'16W" -38.54' to a set mag nail in the center of Roberts Road; thence run along the center of Roberts Road N87 degrees 23'01 "W - 108.75'; thence run N86 degrees 46'53"W - 109.60'; thence run N85 degrees 53'49"W - 120.65'; thence run N86 degrees 30'13"W - 122.43'; thence run N88 degrees 11'22"W - 94.40'; thence run N84 degrees 32'02"W - 138.08'; thence run. N84 degrees 06'34"W - 74.05'; thence run N80 degrees 45'17"W - 54.95'; thence run N76 degrees 47'57"W - 58.85'; thence run N66 degrees 43'42"W - 57.55' to a set mag nail on the East ROW of Hwy. 583; thence leaving the center of Roberts Road, run along the East ROW of Hwy. 583 N07 degrees 36'27"W -495.30'to a set 1/2" re bar; thence leaving the East ROW of Hwy. 583, run N89 degrees 20'55"W - 42.26' to a set 1/2" rebar; thence run N00 degrees 04'33"W - 208.00' to a set 1/2" rebar; thence run S89 degrees 20'55"E - 509.00' to a set 1/2" rebar; thence run N00 degrees 04'33"W - 40.50' to a set 1/2" rebar; thence run S89 degrees 20' 55"E -394.00' to a set 1/2" rebar; thence run S00 degrees 04'33"E - 462.46' to the point of beginning; as per survey dated 11/27 /17 by Bruce E. Ham, PLS-02927.

Being part of the same property described in that certain Decree Discharging Executrix, Etc., recorded in Book 387 at Page 460.

3.      As a result of the offenses alleged in Counts 6 through 9, the defendants, **RYAN P. MULLEN** and **DUANE A. DUFRENE**, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense, and any property traceable to such property.

4.      If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

            a.      cannot be located upon the exercise of due diligence;

            b.      has been transferred or sold to, or deposited with, a third person;

            c.      has been placed beyond the jurisdiction of the Court;

            d.      has been substantially diminished in value; or

            e.      has been commingled with other property which cannot be subdivided without difficulty;

the United States shall seek a money judgment and, pursuant to Title 21, United States Code, Section 853(p), forfeiture of any other property of the defendant up to the value of said property.

A TRUE BILL:

PETER G. STRASSER
UNITED STATES ATTORNEY

EDWARD J. RIVERA
ANDRE J. LAGARDE
Assistant United States Attorneys

New Orleans, Louisiana
October 16, 2020

CLERK'S OFFICE
A TRUE COPY

Oct 16 2020

Deputy Clerk, U.S. District Court
Eastern District Of Louisiana
New Orleans, LA

30

FORM OBD-34

No. _____

# UNITED STATES DISTRICT COURT

_____ Eastern _____ District of _____ Louisiana _____

_____ Criminal _____ Division

## THE UNITED STATES OF AMERICA

vs.

**RYAN P. MULLEN**
**DUANE A. DUFRENE**

## INDICTMENT

FOR

**CONSPIRACY TO COMMIT BANK**
**FRAUD AND MONEY LAUNDERING,**
**BANK FRAUD, AND MONEY LAUNDERING**

**VIOLATIONS:**  18 U.S.C. § 1344
18 U.S.C. § 1349
18 U.S.C. § 1956
18 U.S.C. § 1957
18 U.S.C. § 2

A true _____

Filed in open court this _____ day of _____, A.D. 2020.

_____
Clerk

Bail, $ _____

_____
**EDWARD J. RIVERA**
**Assistant United States Attorney**